**No. 26-1229**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

——————————

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee*,

**v.**

**ISAAC M. NEUBERGER**
*Defendant/Appellant.*

——————————

**On Appeal from the United States District Court
for the District of Maryland
Northern Division (The Hon. Erin Aslan)
Case No. 1:22-cv-02977-EA**

——————————

**CORRECTED BRIEF OF THE APPELLANT**

——————————

<table>
<tr>
<td>

**JAMES P. ULWICK**
**KRAMON & GRAHAM, P.A.**
**750 East Pratt St., Suite 1100**
**Baltimore, MD 21202**
**(410) 752-6030**
**julwick@kg-law.com**

</td>
<td>

**BRANDON N. MOURGES**
**CREPEAU MOURGES**
**1344 Ashton Rd., Suite 110**
**Hanover, MD 21076**
**(667) 900-9912**
**brandon@usataxlaw.com**

</td>
</tr>
</table>

*Counsel for Defendant/Appellant*

---

4902-5919-0190, v. 1

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1229          Caption: USA (Appellee) v. Isaac Neuberger (Appellant)

Pursuant to FRAP 26.1 and Local Rule 26.1,

Isaac Neuberger
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.  Does party/amicus have any parent corporations?   ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:



3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ James P. Ulwick                         Date:   5/21/2026

Counsel for: Appellant Isaac M. Neuberger

- 2 -

**Print to PDF for Filing**

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES ..................................................................................1

STATEMENT OF CASE ......................................................................................2

   I.   Facts Relevant to the Issues on Appeal .......................................................2

   II.   Procedural History ........................................................................................4

   III.  Rulings Presented for Review .......................................................................5

SUMMARY OF ARGUMENT .............................................................................5

STANDARD OF REVIEW ...................................................................................7

ARGUMENT ........................................................................................................9

   I.   The Lower Court's Decision Rests on a Fundamental Misunderstanding of the FTLA. ................................................................................................................9

      A.   Congress Enacted the FTLA to Displace General Priority Doctrines in Tax Cases.................................................................................................................11

      B.   *Romani* Forecloses the Government's Theory. ...........................................12

      C.   The FTLA Does Not Limit Its Displacement of the FPS. ........................13

      D.   The Lower Court's "No Lien, No FTLA" Rule Revives the Superseded Regime. .............................................................................................................14

   II.   The Lower Court Had No Basis for Finding Liability Under the FPS. ........17

      A.   The Lower Court's Ruling: A Preferential Transfer is an "Act of Bankruptcy" Under the FPS................................................................................17

      B.   Background: The History of the FPS and "Acts of Bankruptcy." .............18

      C.   The Lower Court's Finding of Liability Erroneously Relies on a Legal Nullity: "Acts of Bankruptcy" Were Expressly Abolished in 1979..................20

      D.   Despite The Existence of a Comprehensive Bankruptcy Statute, the Lower Court Erroneously Relied on the Repealed Bankruptcy Statute It Replaced. ..23

      E.   The Lower Court Erroneously Disregarded Essential Elements Required for a Preference under the Repealed Bankruptcy Act...................................24

i

F.    The Lower Court's Sole Justification for Liability Relies on a Ninth Circuit Decision That Admittedly Disregarded Essential Statutory Elements to Impose Liability. ..................................................................................26

G.    The Lower Court Also Disregarded Precedent from the Supreme Court and This Court to Expand the FPS Beyond Collective Proceedings. .......................30

III.  The Lower Court's Judgment Violates Multiple Equitable Doctrines of Consistency and Lacks Evidentiary Support...........................................................31

A.    The Government's Inconsistent Positions .................................................32

B.    The Lower Court's Adoption of The Government's Inconsistent Positions.. ...................................................................................................................34

C.    The Lower Court Adopted the Erroneous Debt-Equity Determination in Order to Avoid Apparent and Incompatible Inconsistencies...........................36

D.    The Lower Court's Determination Violates Principles of Judicial Estoppel. ...................................................................................................................39

E.    The Lower Court's Determination Violates the Related Doctrine of Consistency.................................................................................................42

F.    The Lower Court's Determination Lacks Evidentiary Support.................45

1.    The Lower Court Erroneously Relied Exclusively on an Unqualified Expert's Opinion on a Question of Law. ...................................................45

2.    The Analysis for Making Debt-Equity Determinations Is the Same for Purposes of Tax and Insolvency. ...............................................................47

CONCLUSION .......................................................................................................49

REQUEST FOR ORAL ARGUMENT...................................................................49

CERTIFICATE OF COMPLIANCE ......................................................................50

ii

**TABLE OF AUTHORITIES**

## Cases

*Alamo Nat'l Bank v. Commissioner*, 95 F.2d 622 (5th Cir. 1938) ............................43

*Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir. 1982)................................................40

*Anderson v. Bowers*, 117 F. Supp. 884 (D.S.C. 1954) ...............................................45

*Bramwell v. U.S.F. & G. Co.*, 269 U.S. 483 (1926) ....................................................35

*Broughman v. Carver*, 624 F.3d 670 (4th Cir. 2010) ....................................................7

*Bull v. United States*, 295 U.S. 247 (1935) .................................................................41

*Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102 (1944) ...............................27

*Coder v. Arts*, 213 U.S. 223 (1909)..............................................................................29

*Conard v. Atlantic Ins. Co.*, 26 U.S. 386 (1828).........................................................30

*Conway Import Co. v. United States*, 311 F. Supp. 5 (E.D.N.Y. 1969) ....................44

*Cook County National Bank v. United States,* 107 U.S. 445 (1883) ........................24

*Core Communs., Inc. v. Verizon Maryland LLC*, 744 F.3d 310 (4th Cir. 2014) .......41

*Davis v. Woolf*, 147 F.2d 629 (4th Cir. 1945)...............................................................29

*Estate of Ashman v. Commissioner*, 231 F.3d 541 (9th Cir. 2000) ...........................44

*Ex parte McCardle*, 74 U.S. 506 (1869)......................................................................24

*Farmers' Bank of Delaware v. Beaston,* 7 G. & J. 421 (Md. 1836) ..........................18

*Gill v. Jus. Broad. Corp.*, 2024 U.S. Dist. LEXIS 160831 (E.D.N.Y. Sep. 6, 2024)45

*Guarantee Title & Trust Co. v. Title Guaranty & Surety Co.*, 224 U.S. 152 (1912)22, 24

*Holland v. Pardee Coal Co.*, 269 F.3d 424 (4th Cir. 2001) .........................................7

*In re Autostyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001)................................37, 47

*In re Cold Harbor Assocs.*, 204 B.R. 904 (Bankr. E.D. Va. 1997) ...........................37

*In re Dornier Aviation (N. Am.), Inc.,* 453 F.3d 225 (4th Cir. 2006) ............36, 38, 47

*In re Flashcom, Inc.*, 503 B.R. 99 (C.D. Cal. 2013).......................................................7

*In re Franklin Equip. Co.*, 416 B.R. 483 (Bankr. E.D. Va. 2009) .............................38

*In re Georgetown Bldg. Assocs. Ltd. P'ship*, 240 B.R. 124 (Bankr. D.D.C. 1999) ..38

*In re Hedged-Investment Assocs.*, 380 F.3d 1292 (10th Cir. 2004) ..........................47

*In re HH Liquidation, LLC*, 590 B.R. 211 (Bankr. D. Del. 2018) ............................37

*In re Highland Constr. Mgmt. Servs., LP*, 569 B.R. 673 (E.D. Va. 2017)................38

*In re Horstemeyer*, 2016 Bankr. LEXIS 2471 (Bankr. D.S.C. June 30, 2016).........44

*In re Kreidler Import Corp.*, 4 B.R. 256 (Bankr. D. Md. 1980) ................................21

*In re Lamar Haddox Contractor*, 40 F.3d 118 (5th Cir. 1994) ................................46

iii

*Indmar Prods. Co. v. Commissioner*, 444 F.3d 771 (6th Cir. 2006) .......................... 45

*Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584 (4th Cir. 2002) ............................. 8

*James v. United States*, 366 U.S. 213 (1961) ............................................................... 31

*Johnston v. United States*, 605 F. Supp. 26 (D. Mo. 1984) ......................................... 44

*Joseph Eichelberger & Co. v. Commissioner*, 88 F.2d 874 (5th Cir. 1937) ............. 43

*Kennebec Box. Co. v. O.S. Richards Corp.*, 5 F.2d 951 (2d Cir. 1925) ..................... 31

*King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192 (4th Cir. 1998) ................... 41

*King v. United States,* 379 U.S. 329 (1964) ................................................................ 19

*Lakeshore Apartments, Inc. v. United States*, 351 F.2d 349 (9th Cir. 1965) ....... 26, 27

*Law Offices of Jonathan A. Stein v. Cadle Co.*, 87 F. Supp. 2d 1015 (C.D. Cal. 1999) .......................................................................................................................... 10

*Lewis v. United States*, 92 U.S. 618 (1875) ................................................................ 18

*Lowery v. Stovall*, 92 F.3d 219 (4th Cir. 1996) ......................................................... 40

*Martineau v. Wier*, 934 F.3d 385 (4th Cir. 2019) ...................................................... 40

*Med. Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025) ................................................. 40

*Minnieland Private Day Sch., Inc. v. Applied Underwriters*, 867 F.3d 449 (4th Cir. 2017) .......................................................................................................................... 39

*Nease v. Ford Motor Co.*, 848 F.3d 219 (4th Cir. 2017) .............................................. 8

*Neuberger, Quinn v. United States*, 2024 U.S. Dist. LEXIS 114060 (D. Md. June 28, 2024) .......................................................................................................................... 44

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ......................................................... 40

*Nutritional Health Alliance v. FDA*, 318 F.3d 92 (2d Cir. 2003) .............................. 10

*Orange Securities Corp. v. Commissioner*, 131 F.2d 662 (5th Cir. 1942) ................ 44

*Pegram v. Herdrich*, 530 U.S. 211 (2000) ........................................................... 34, 40

*Phillips v. Dime Trust & Safe Deposit Co.*, 284 U.S. 160 (1931) .............................. 24

*Prince v. Bartlett,* 12 U.S. 431 (1814) ........................................................................ 18

*Robb v. Vos*, 155 U.S. 13 (1894) ................................................................................. 42

*Rollins v. Commissioner*, 1993 Tax Ct. Memo LEXIS 659 (T.C. Dec. 30, 1993) .... 45

*Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625 (6th Cir. 1986) ....................... 47

*Route 231, LLC v. Commissioner*, 810 F.3d 247 (4th Cir. 2016) .............................. 43

*Sardis v. Overhead Door Corp.*, 10 F.4th 268 (4th Cir. 2021) .................................... 8

*Sirbo Holdings, Inc. v. Commissioner*, 476 F.2d 981 (2d Cir. 1973) ........................ 44

*Suazo v. Meiburger*, 2025 U.S. Dist. LEXIS 117840 (E.D. Va. June 20, 2025) ......... 7

*Texas Farm Bureau v. United States*, 725 F.2d 307 (5th Cir. 1984) ........................... 8

iv

*Townsend v. Little*, 109 U.S. 504 (1883)................................................................28

*Tyger Const. Co. v. Pensacola Constr. Co.*, 29 F.3d 137 (4th Cir. 1994) .................46

*United States v. Brown*, 86 F.2d 798 (6th Cir. 1936) ..............................................42

*United States v. Coppola*, 85 F.3d 1015 (2d Cir. 1996) .............................................8

*United States v. Crosland Constr. Co.*, 120 F. Supp. 792 (D.S.C. 1954).................30

*United States v. Estate of Romani*, 523 U.S. 517 (1998) ...................................passim

*United States v. Golden Acres, Inc.* 684 F. Supp. 96 (D. Del. 1988) ........................22

*United States v. Greenville,* 118 F.2d 963 (4th Cir. 1941) ........................................30

*United States v. Joshua*, 607 F.3d 379 (4th Cir. 2010)................................................7

*United States v. Kimbell Foods*, 440 U.S. 715 (1979) ..............................................16

*United States v. Marxen*, 307 U.S. 200 (1939) ........................................................31

*United States v. Motsinger*, 123 F.2d 585 (4th Cir. 1941) .......................................15

*United States v. Oklahoma*, 261 U.S. 253 (1923) .....................................................19

*United States v. Oregon Lumber Co.*, 260 U.S. 290 (1922) ......................................42

*United States v. Russell*, 2002 U.S. Dist. LEXIS 21003 (E.D. Mich. Aug. 22, 2002) .......................................................................................................10, 11

*United States v. State Street Bank & Tr. Co.*, 520 B.R. 29 (Bankr. D. Del. 2014)....37

*United States v. Vertac Chem. Corp.*, 671 F. Supp. 595 (E.D. Ark. 1987) ..............22

*Van Iderstine v. National Discount Co.*, 227 U.S. 575 (1913)..................................29

*Vestal v. Commissioner*, 152 F.2d 132 (D.C. Cir. 1945) ..........................................43

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022).....................................................28

## Statutes

11 U.S.C. § 107(d) (1976) (repealed 1978) .............................................................20

11 U.S.C. § 21(a) (1976) (repealed 1978) ...........................................................20, 22

11 U.S.C. § 96(a)(1) (1976) (repealed 1978)......................................................20, 25

26 U.S.C. § 6213 ........................................................................................................10

26 U.S.C. § 6303 ........................................................................................................10

26 U.S.C. § 6321 ..................................................................................................passim

26 U.S.C. § 6323 .....................................................................................1, 11, 13, 14

26 U.S.C. § 7402 ..........................................................................................................1

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1340 ..........................................................................................................1

28 U.S.C. § 1345 ..........................................................................................................1

31 U.S.C. § 3713 ...................................................................................................passim

4902-5919-0190, v. 1

31 U.S.C. § 3713(a)(2) ...................................................................................21

31 U.S.C. § 3713(b) ...............................................................................1, 4, 21

Bankruptcy Act of 1800 (repealed 1803) ......................................................19

Bankruptcy Act of 1841 (repealed 1843) ......................................................20

Bankruptcy Act of 1867 (repealed 1878) ......................................................20

Bankruptcy Act of 1898 (repealed 1978) ...............................................passim

Bankruptcy Reform Act of 1978 .............................................................passim

## Other Authorities

Hon. Rebecca B. Connelly, *A Brief Look at (Some of) the History of Voluntary Bankruptcy in America*, available at: mow.uscourts.gov/sites/mow/files/Connelly_history_doc.pdf (last visited May 18, 2026) ............................................................................................................19

IRS Field Service Advice 200026006 (March 21, 2000) ...............................44

Maloy, Richard H.W., *The Priority Statute - The United States' "Ace in the Hole"*, 39 J. Marshall L. Rev. 1205 (2006) ........................................................18, 23

Opening Brief of the United States, *United States v. Estate of Romani*, No. 96-1613 (Supreme Court 1996) ................................................................................12

Transcript of Oral Argument, *United States v. Estate of Romani*, No. 96-1613 (Supreme Court Jan. 12, 1998) ..................................................................14

## Rules

Fed. R. App. P. 4(b)(1) ....................................................................................1

Fed. R. App. P. 4(b)(6) ....................................................................................1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 31 U.S.C. § 3713 ("the Federal Priority Statute" or "FPS"), 28 U.S.C. § 1340, 28 U.S.C. § 1345, and 26 U.S.C. § 7402.  Judgment was entered in favor of the United States of America ("the Government") on its sole claim on January 23, 2026.  JA76, JA89.  Defendant Isaac Neuberger ("Appellant") timely filed his Notice of Appeal on February 20, 2026. JA104; *see* Fed. R. App. P. 4(b)(1), (b)(6).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Did the lower court err by allowing the Government to invoke the FPS and impose personal fiduciary liability under § 3713(b) for a tax claim where the Government failed to comply with the Federal Tax Lien Act ("FTLA"), 26 U.S.C. §§ 6321–6323?

2.      Did the lower court err by imposing liability for "acts of bankruptcy" under the FPS in light of the abolition of the concept of "acts of bankruptcy" by the Bankruptcy Reform Act of 1978?

3.      Did the lower court err by finding "preferences" to be "acts of bankruptcy" within the meaning of the FPS where the former Bankruptcy Act defined "preferences" to be transfers undertaken within four months of a petition in bankruptcy, and it was undisputed that no such petition was ever filed?

1

4902-5919-0190, v. 1

4.      Did the lower court err by imposing liability under the FPS for an "act of bankruptcy" in the absence of a collective proceeding?

5.      Did the lower court err by allowing the Government to present mutually inconsistent positions on material facts, and then relying on both inconsistent positions in its verdict?

## STATEMENT OF CASE

### I.      Facts Relevant to the Issues on Appeal

This case arises from the Government's effort to impose personal liability on Appellant under the FPS, for the unpaid federal income taxes of Lehcim Holdings, Inc. ("Lehcim"). Lehcim is a Maryland corporation formed in 2001 to hold investments for the benefit of the Konig family. JA43, JA45. Appellant served as Lehcim's sole director and president and acted at all times at the direction of Lehcim's beneficial owner, Michel Konig. JA43, JA45. Lehcim received advances from related Konig-family entities, including Nightingale Ventures, Ltd. ("Nightingale"), which were consistently reported on Lehcim's tax returns as loans, and for which Lehcim claimed interest deductions. JA45, JA47.

Following a multi-year IRS examination of Lehcim's 2010-2015 tax years, the IRS determined that the Nightingale advances were not bona fide debt and disallowed Lehcim's related interest deductions, thereby proposing additional income tax liabilities. JA47, JA49. On March 14, 2019, the IRS issued a "30-day

2

letter" to Lehcim identifying proposed tax deficiencies, penalties, and interest totaling $1,880,987.96 for those years. JA48.  On November 20, 2019, the IRS mailed a statutory notice of deficiency asserting unpaid taxes and penalties of $1,435,245 (exclusive of interest). JA48.  In July 2020, the IRS assessed the asserted deficiencies.  JA49.

After receiving the March 2019 30-day letter and before any tax assessment or federal tax lien, Lehcim undertook an intercompany "repayment plan" designed to unwind and repay the Nightingale advances and other related company debts. JA49-JA53.  That plan involved ten rounds and over one hundred payments among Konig-family entities, including Lehcim, between June 2019 and March 2020. JA49, JA52.  As part of the plan, Lehcim transferred a total of $8,816,813 to Nightingale. JA52.  The lower court found that Lehcim made the transfers while it was insolvent under a balance-sheet test, by including the Nightingale balances as bona fide liabilities.  JA57-JA58, JA65, JA68.  But, the lower court also found that the Government had a valid claim for taxes in which the Government contended that those same balances were equity (or not bona fide liabilities).  JA63-JA64, JA29.

At no point during the relevant period (i.e., when any payments were made by Lehcim) did the IRS assess Lehcim's taxes, file a federal tax lien, or provide notice of tax-lien priority under the FTLA.  JA49.

3

## II.    Procedural History

The Government commenced this action on November 16, 2022, asserting a single claim under the FPS by which it sought to hold Appellant personally liable for Lehcim's unpaid taxes. JA41.  The Government did not sue Lehcim and did not assert any claim under the Internal Revenue Code or the FTLA.  Appellant moved to dismiss and later for summary judgment, arguing that the FPS could not be used to collect tax liabilities where the Government failed to comply with the FTLA and that the FPS did not apply for multiple reasons. JA1, JA13.  The lower court rejected those arguments in interlocutory rulings.  *Id*.

The lower court (Aslan, U.S.M.J) conducted a three-day bench trial from August 4–6, 2025, limited to the Government's sole § 3713 claim.  On October 23, 2025, the lower court issued Findings of Fact and Conclusions of Law under Rule 52 holding Appellant personally liable under § 3713(b).  JA41.  The lower court concluded that the Government established: (1) a debt owed to the Government; (2) Lehcim's insolvency; and (3) the commission of an "act of bankruptcy" based on Lehcim's preferential repayments to Nightingale.  JA41.  Following supplemental briefing and argument on damages, the lower court entered final judgment on January 23, 2026, awarding the United States $1,880,987.96 against Appellant based on the amounts stated in the 30-day letter. JA76, JA89.  This appeal followed.

4902-5919-0190, v. 1

### III.     Rulings Presented for Review

The rulings presented for review are:

- Memorandum Opinion denying Appellant's Motion to Dismiss (JA1)

- Order denying Appellant's Motion to Dismiss (JA12)

- Memorandum Opinion denying Motions for Summary Judgment (JA13)

- Order denying Government's Motion for Summary Judgment and Appellant's Cross-Motion for Summary Judgment (JA40)

- Memorandum of Decision (JA41)

- Order finding Appellant Personally Liable under FPS (JA75)

- Memorandum Opinion entering Judgment against Appellant in the amount of $1,880,987.96 (JA76)

- Order of Judgment in the amount of $1,880,987.96 against Appellant (JA89)

## SUMMARY OF ARGUMENT

First, the lower court incorrectly allowed the Government to use the FPS to circumvent the FTLA. Congress enacted the FTLA to define exclusively when federal tax claims may obtain priority. Allowing the Government to invoke the FPS precisely where the FTLA clearly withholds it nullifies Congress's scheme and restores the regime of secret, unperfected tax priority Congress abolished and the Supreme Court rejected in *United States v. Estate of Romani*, 523 U.S. 517 (1998) ("*Romani*").

5

Second, the court misapplied the FPS. "Acts of bankruptcy" were abolished by Congress in the Bankruptcy Reform Act of 1978, and the court erred in imposing FPS liability on Appellant for an "act of bankruptcy."

Third, the lower court erred in imposing liability on Appellant for a preferential payment. The court used the Bankruptcy Act of 1898 to define "acts of bankruptcy" when that statute was repealed almost 50 years ago. Moreover, even if the court was correct to use the repealed statute to include a preferential payment as an "act of bankruptcy," it erred by failing to limit preferential payments – as the statute does – to payments within four months of a petition for bankruptcy. It is undisputed that no such petition was ever filed.

Fourth, for more than two centuries, the Supreme Court has held that federal priority arises only in narrow contexts involving a formal, collective process – such as bankruptcy, receivership, or estate administration – where assets are placed beyond the debtor's control. Here, no such proceeding existed. Moreover, treating all payments by an insolvent entity as "preferences" constituting "acts of bankruptcy" converts the statute into strict liability, radically expanding officer liability far beyond anything Congress authorized.

Fifth, the judgment against Appellant cannot stand because it rests on irreconcilably inconsistent positions. The Government established its tax claim by treating certain advances to the taxpayer-debtor as equity. It then proved another

6

4902-5919-0190, v. 1

essential element of its FPS claim – insolvency – by reversing course and treating the same advances as debt. Courts do not permit a party to prevail by toggling between mutually exclusive characterizations to satisfy different statutory elements. Once the Government's positions are treated consistently, insolvency disappears for all but the final two transfers – and with it the basis for the bulk of the damages imposed by the court under the FPS.

## STANDARD OF REVIEW

This appeal primarily involves questions of law, including the relationship of the FPS to the FTLA, and the viability and interpretation of a key term under the FPS. Questions of statutory interpretation and the scope of priority are reviewed de novo. *See Broughman v. Carver*, 624 F.3d 670, 674 (4th Cir. 2010) ("a question of statutory interpretation, a quintessential question of law, which we review de novo"); *United States v. Joshua*, 607 F.3d 379, 382 (4th Cir. 2010). Under this standard, the Court affords no deference to the lower court's legal conclusions. *Holland v. Pardee Coal Co.*, 269 F.3d 424, 430 (4th Cir. 2001).

The finding of insolvency is nominally reviewed for clear error. *See, e.g., Suazo v. Meiburger*, 2025 U.S. Dist. LEXIS 117840, *10 (E.D. Va. June 20, 2025) (proof of whether determination of value of assets and liabilities generally done on clear error standard); *In re Flashcom, Inc.*, 503 B.R. 99, 121 (C.D. Cal. 2013) ("Findings of fact, such as the finding of insolvency, are reviewed for clear error.").

7

4902-5919-0190, v. 1

However, where that determination turns on legal classifications, including whether advances constitute debt or equity or whether they gave rise to enforceable liabilities at all, review is effectively *de novo*. Findings resting on an erroneous legal premise or impermissible methodology are not entitled to deference. *See United States v. Coppola*, 85 F.3d 1015, 1019 (2d Cir. 1996) (conclusions of law, including those derived from application to a court's findings of facts, reviewed *de novo*); *Texas Farm Bureau v. United States*, 725 F.2d 307, 310 (5th Cir. 1984) (debt-equity characterization determined as a matter of law).

Finally, the lower court's acceptance of internally inconsistent factual positions advanced by the Government raise issues of equitable doctrines and evidentiary sufficiency. The former is reviewed for abuse of discretion. *Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 595 n. 7 (4th Cir. 2002). Findings premised on non-evidence or legal conclusions offered by unqualified experts cannot stand and are reviewed *de novo*. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 275 (4th Cir. 2021) (while admission of expert testimony reviewed for abuse of discretion, related insufficient admissible evidence reviewed as matter of law); *Nease v. Ford Motor Co.*, 848 F.3d 219, 228, 234 (4th Cir. 2017) (underlying evidentiary question reviewed for abuse of discretion; judgment based on non-evidence reviewed as matter of law).

8

## **ARGUMENT**

**I.     The Lower Court's Decision Rests on a Fundamental Misunderstanding of the FTLA.**

The lower court held that the FTLA was "inapplicable" because no federal tax lien had arisen at the time of the challenged transfers.  JA4-JA6, JA60-JA63.  From that premise, it erroneously concluded the United States could proceed exclusively under the FPS.  JA63.  However, the fact that no tax lien had arisen at the time of the transfers requires the opposition conclusion: the government is denied priority and no third-party liability can exist.

The court seemed to think that the FTLA is a post-lien tiebreaker that becomes relevant only after the IRS has assessed a tax and recorded a lien.  Not so. It is the statute by which Congress decided ***when and how federal tax claims may obtain priority at all***.  *See Romani* at 532-34.   In the words of the Supreme Court:

> There are sound reasons for treating the Tax Lien Act of 1966 as the governing statute when the Government is claiming a preference in the insolvent estate of a delinquent taxpayer…***[The Tax Lien Act of 1966] represents Congress' detailed judgment as to when the Government's claims for unpaid taxes should yield to many different sorts of interests*** (including, for instance, judgment liens, mechanic's liens, and attorneys' lien) in many different types of property (including, for example, real property, securities, and motor vehicles.  ***Indeed given our unambiguous determination that the federal interest in the collection of taxes is paramount to its interest in enforcing other claims, it would be anomalous to conclude that Congress intended the priority statute to impose greater burdens on the citizen than those specifically crafted for tax collection purposes.***

*Id.* at 532 (citations omitted) (emphasis supplied).

9

Indeed, the FTLA provides that the government may not enforce tax claims until an assessment has been made or judgment obtained. 26 U.S.C. § 6213 (deficiency assessments cannot be made, and no collection can commence administratively or judicially, prior to notice and opportunity for Tax Court proceeding); 26 U.S.C. § 6303 (notice and demand after assessing tax); 26 U.S.C. § 6321 (lien arises after not paid after notice and demand).

The Magistrate Judge's interpretation reverses the statute's function and nullifies its procedural safeguards.  It directly contradicts *Romani*.  And it cannot be squared with the cases the court cited.  *See, e.g., Law Offices of Jonathan A. Stein v. Cadle Co.*, 87 F. Supp. 2d 1015, 1020 (C.D. Cal. 1999), *aff'd*, 250 F.3d 716 (9th Cir. 2001) ("The Court agrees that the provisions of the Tax Lien Act would trump the Insolvency Statute if the Tax Lien Act applied."; however, finding it did not apply there because the IRS was not collecting a debt owed by a taxpayer).  Absence of a federal tax lien does not open the door to the FPS.  It closes it.

The lower court relied predominantly on *United States v. Russell*, 2002 U.S. Dist. LEXIS 21003 (E.D. Mich. Aug. 22, 2002) for support.  JA4-JA6, JA62.  *Russell* has never been adopted by any other court.[1]  There, the court read *Romani* to mean

---

[1] In its opinion, the court incorrectly suggested that other circuits have adopted this approach.  JA61.  In fact, in *Nutritional Health Alliance v. FDA*, 318 F.3d 92, 102 (2d Cir. 2003), cited by the lower court, the Second Circuit stated, that "the government could not circumvent the limitations imposed upon it by the FTLA in a case involving a federal tax claim by relying on the broadly applicable priority statute."  The FTLA requires a tax lien to begin with which, in turn, requires an assessment – none of which existed here.  Neither of the other cases cited by the lower court use the same logic as the district court in *Russell*.

10

that "the Tax Lien Act is 'the governing statute when the Government is claiming a preference in the insolvent estate of a delinquent taxpayer.'" *Id.* at *7. But the *Russell* court, within the context of an estate, found that 26 U.S.C. § 6323 did not specifically address certain other interests and it was possible that the government's lien could trump other interests. Setting aside that the government actually possessed a lien there (unlike here), *Russell* unnecessarily restricted *Romani* to "the four classes of creditors in § 6323." Nothing in *Romani* stands for such a limitation. *Romani* noted that the FTLA includes 26 U.S.C. § 6321 et seq. (i.e., it requires a lien and assessment). While it did not matter in *Russell* **because the government had a statutory lien prior to the payments**, a tax lien is still required to avoid conflict between the FTLA and FPS. *Russell* is neither controlling nor persuasive.

### A. Congress Enacted the FTLA to Displace General Priority Doctrines in Tax Cases.

Before 1966, federal tax collection operated under a regime that sometimes allowed priority to attach without assessment, without lien perfection, and without notice. Congress regarded that regime as untenable. The FTLA replaced it. The statute establishes a sequenced framework:

1. A tax lien arises only after assessment and demand. 26 U.S.C. § 6321.
2. That lien is invalid against third parties absent compliance with notice rules. 26 U.S.C. § 6323 (a).
3. Only certain protected creditors may defeat a perfected lien. *Id.*

11

As the Supreme Court explained, the 1966 amendments "bespeak a strong condemnation of secret liens" and reflect Congress's decision to regulate tax priority comprehensively and transparently. *Romani* at 533-34. Congress specifically denied priority to potential federal tax claims ***even when they had become a lien and, in some cases, even where that lien was perfected by notice filing***. The FTLA was not enacted to coexist alongside the FPS; it was enacted to replace it. *Id.* (the FPS yields because it would otherwise "frustrate a specific policy embodied in a later federal statute" that is "more specific" and "comprehensive"). The court's reading – permitting the FPS to trump where the FTLA withholds priority – defeats that design.

### B.      *Romani* Forecloses the Government's Theory.

The Supreme Court rejected the same theory in *Romani*. The Government argued to the Supreme Court that the FPS remained independently available in tax cases even where the FTLA would deny priority. Opening Brief of the United States at 22, *United States v. Estate of Romani*, No. 96-1613 (Supreme Court 1996). ADD167. The Supreme Court disagreed, holding Congress curtailed its operation in the tax context by enacting the FTLA. *Romani* at 532-33.

The Supreme Court emphasized not once, but multiple times, that:

- The FTLA reflects Congress's intent to channel tax priority through assessment, lien creation, and notice (*see id.* at 532);
- Nothing in the FPS authorizes the Government to obtain "the equivalent of a secret lien" as a substitute for the tax lien Congress regulated (*id.* at 534);

12

- It would be "anomalous" to permit the Government to impose greater burdens through the FPS than through the FTLA's carefully calibrated mechanisms (*id.* at 532).

Those statements were not dicta. They were central to the Supreme Court's statutory analysis and formed the basis for rejecting the Government's fallback reliance on the FPS. And, critically, *Romani* did not turn on the identity of the competing creditor. The Supreme Court addressed the ***structure of federal tax priority*** and the impropriety of using the FPS to bypass Congress's chosen tax-collection procedures. *See id.* at 532-34 ("…the Committees' failures to report the proposals to the entire Congress do not necessarily indicate that any legislator thought that the priority statute should supersede the Tax Lien Act in the adjudication of federal tax claims."). The Magistrate Judge's effort to cabin the FTLA to secured-creditor disputes ignores *Romani*. JA62.

## C.    The FTLA Does Not Limit Its Displacement of the FPS.

The court here reasoned that because the transferees here were not purchasers, holders of security interests, mechanic's lienors, or judgment lien creditors, the FTLA cannot apply. *Id*. That reasoning rests on statutory inversion and conflicts with *Romani*.

Section 6323(a) limits who may defeat a tax lien once it exists under section 6321. It does not define when Congress displaced the FPS. Section 6323 was enacted as part of a broader reform designed to regulate the creation and

13

enforceability of the federal tax priority itself. *Romani* at 523-24, 532-33. Nothing in section 6323 suggests Congress intended a wholesale reversion to pre-1966 priority doctrines whenever a creditor falls outside the enumerated classes. To the contrary, *Romani* clarifies that the FTLA reflects Congress's rejection of precisely that kind of lien-less priority. *Id.* at 534.

*Romani* reflects the underlying assumption that government enforcement of tax claims is predicated on liens (i.e., assessed taxes). Indeed, the Government argued it needed no lien to assert priority under the FPS – i.e., it could use the FPS to overcome the express ordering provided in the FTLA. Transcript of Oral Argument at 26, 37-38, *United States v. Estate of Romani*, No. 96-1613 (Supreme Court Jan. 12, 1998). ADD198, ADD209-ADD210. That argument was rejected. No case decided since *Romani* allows priority under the FPS where no tax lien exists.

**D.     The Lower Court's "No Lien, No FTLA" Rule Revives the Superseded Regime.**

The court's ruling produces a perverse result: the Government gains more power by ***not*** assessing taxes. Under the court's approach, the IRS may impose priority through the FPS for taxes:

- before assessment,
- before lien creation, and
- without public notice.

That is not an insignificant consequence – it is the very regime Congress sought to end. *See, e.g., Romani* at 532 (the FTLA "represents Congress' detailed

14

judgment as to when the Government's claim for unpaid taxes should yield" and "reflect[s] an obvious attempt to accommodate the strong policy objections to the enforcement of secret liens"). Congress did not intend the Government to have a stronger position as an unsecured claimant than as a secured one. *Id.* at 533; *see also id.* at 534 (rejecting use of the FPS as lien substitute). The lower court's interpretation restores, wholesale (if not going beyond that), the pre-1966 "secret priority" system the FTLA dismantled and actively encourages a result that appears to be the opposite of Congress's intent. Adopted literally, it allows the Government to argue, although it failed to obtain a lien or provide notice prior to competing creditors, it may rely on yet-unknown future claims if the debtor becomes insolvent. If Congress disdained "secret liens" without notice, it necessarily disdained things, like here, that might never even become a secret lien.

Fundamentally, the Government's theory allows the IRS to assert priority against third parties when it concededly could not assert priority – indeed, could not even enforce collection – against the taxpayer itself. *Cf. United States v. Motsinger*, 123 F.2d 585, 589 (4th Cir. 1941) ("To treat the liability of the fiduciary as an entirely new and independent liability and to close one's eyes to the patent fact that it is, in reality, the old tax liability of the original taxpayer ... [is] to invoke against him the harshest sort of technicality. We are wisely forbidden to give the taxing acts such an interpretation."). At the time of the challenged transfers, the United States possessed

15

no enforceable tax collection right against Lehcim.  Since Congress specifically prohibited tax collection against Lehcim, Congress could not have intended the Government to avoid that policy by collecting it from a third-party.

Nothing in the FPS authorizes such an anomaly, and nothing in the FTLA permits it.  Statutory interpretation does not countenance a system where collection is weakest against the taxpayer and strongest against those alleged to be secondarily responsible.  Congress did not design a regime under which the IRS can simply recast its unassessed tax claim as fiduciary liability. That result would not merely circumvent the FTLA; it would nullify it.  *See also Romani* at 533-34; *United States v. Kimbell Foods*, 440 U.S. 715, 728-29 (1979) (statutory interaction is governed by substance, not labels).  The FTLA cannot be avoided by labeling the action one in "fiduciary liability" where it is based solely upon collection of federal taxes.

To that end, there is no case where the IRS successfully asserted priority under the FPS without either first possessing a lien or without presenting a claim in a collective proceeding.  If the tax "claim" could be divorced from the lien requirement, it would be unnecessary to determine the primacy of its lien at all under the FTLA.  But it cannot, because the tax system's mode of enforcement is entirely based on the notion of liens – not generalized claims.

16

Accordingly, the lower court's determination that the FPS creates a separate cause for tax claims that can be brought without any assessment and irrespective of the FTLA must be rejected as error.

**II.     The Lower Court Had No Basis for Finding Liability Under the FPS.**

**A.     The Lower Court's Ruling: A Preferential Transfer is an "Act of Bankruptcy" Under the FPS.**

In determining liability, the Magistrate Judge correctly recognized that "[t]he [FPS] requires that a ***statutorily defined triggering event*** occur for the United States' claim to have priority."  JA69.  The lower court ruled only on section (a)(1)(A)(iii) of the FPS, which provides that "[a] claim of the United States Government shall be paid first when ... a person indebted to the Government is insolvent and … an act of bankruptcy is committed."  The court held "Lehcim's transfers to Nightingale under the repayment plan were preferential transfers, which constitute acts of bankruptcy." JA70-JA71.  And, in its opinion, "[a] preferential transfer is a transfer…of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent."  JA71. The Magistrate Judge found these elements were satisfied because Lehcim was insolvent and it repaid obligations predating the Government's tax claim. JA71.  In the court's view, an "act of bankruptcy occurs" so long as a debtor is insolvent and then pays

17

*anyone*.  As set forth *infra* in subsections II(C) through II(G), the lower court's determination is clearly wrong as a matter of law for multiple reasons.

### B.    Background: The History of the FPS and "Acts of Bankruptcy."

The FPS is one of the oldest statutes in the United States Code.  It was first enacted in 1789, and its text has been "virtually unchanged" since 1797.  *Romani* at 524.  It has been interpreted 48 times by the United States Supreme Court. Maloy, Richard H.W., *The Priority Statute - The United States' "Ace in the Hole"*, 39 J. Marshall L. Rev. 1205 (2006).

The FPS does not provide a statutory definition for "acts of bankruptcy."  No federal bankruptcy law existed when the FPS was initially enacted.  From the early days of the United States thru the 20th Century, the Supreme Court interpreted the term by reference to "legal bankruptcy," as later enacted. *Prince v. Bartlett,* 12 U.S. 431, 434 (1814) (required "legal and known insolveney [sic] manifested by some notorious act of the debtor pursuant to law"); *Farmers' Bank of Delaware v. Beaston,* 7 G. & J. 421, 426 (Md. 1836) (since there was no bankrupt law in 1797, "[t]he words in this connection seem to have reference to the previous cases put in the section, and to point out some legal insolvency, or some mode of proceeding, by which the property of the debtor is taken out of his hands, and to be distributed by others, *1 Paine's C.C. 629.*"), *affirmed, Beaston v. Farmers' Bank of Delaware*, 37 U.S. 102, 133-135 (1838); *Lewis v. United States*, 92 U.S. 618, 621 (1875) ("must

18

be bankruptcy or else insolvency, as the latter is defined by the statute and the authorities upon the subject"); *United States v. Oklahoma*, 261 U.S. 253, 262-263 (1923) (denying claim because the "facts set forth in the complaint do not constitute an act of bankruptcy as defined by the federal Bankruptcy Act (section 3a)"; claim did not contain "act of bankruptcy as defined by applicable federal legislation on the subject of bankruptcies"); *King v. United States,* 379 U.S. 329, 335 (1964) (same).

Because the Supreme Court has defined "acts of bankruptcy" by reference to the "acts of bankruptcy" codified in the contemporaneous bankruptcy laws, an historical overview of "acts of bankruptcy" under prior bankruptcy statutes from 1800, 1841, 1867, and 1898 is helpful. *See generally* Hon. Rebecca B. Connelly, *A Brief Look at (Some of) the History of Voluntary Bankruptcy in America*, available at: mow.uscourts.gov/sites/mow/files/Connelly_history_doc.pdf (last visited May 18, 2026). ADD114. In 1800, "acts of bankruptcy" consisted generally of departing from the state, concealing oneself or keeping oneself in one's house, allowing property to be attached, or making fraudulent conveyances. *See* Bankruptcy Act of 1800, Sess. I, Ch. 19 (1800) (repealed 1803). ADD38. Each of these "acts of bankruptcy" permitted a petition in bankruptcy by a creditor if filed within six months of an act of bankruptcy. The 1800 Act did not provide any reference to preferences. In 1841, "acts of bankruptcy" included departing the state with intent to defraud creditors, concealing one's self to avoid arrest, allowing one's self to be

19

arrested or property to be attached in execution, or making fraudulent conveyances. Bankruptcy Act of 1841, Sess. I. Ch. 9 (1841) (repealed 1843). ADD56. In 1867, involuntary bankruptcy could result from "acts of bankruptcy" similar to those in the 1841 Act, but included certain preferences within its coverage. Bankruptcy Act of 1867, ch. 176, 14 Stat. 517 (repealed 1878). ADD66. Creditors were required to petition for bankruptcy within six months of the "act of bankruptcy."

The final bankruptcy statute before the modern-day construct was the Bankruptcy Act of 1898. Although modified on occasions, it lasted in substantially the same form until 1979. In its final iteration, "acts of bankruptcy" included certain fraudulent transfers, certain preferences, allowing liens to attach to property while insolvent, general assignments for the benefit of creditors, appointments of a receiver or trustee, and voluntary declarations of bankruptcy. 11 U.S.C. § 21(a) (1976) (repealed 1978). ADD5. Under this statute, "constructively" fraudulent transfers were only "acts of bankruptcy" if committed within a period of time relative to a petition – either four months or one year. 11 U.S.C. § 107(d) (1976) (repealed 1978). ADD30. Preferences were only "acts of bankruptcy" if committed within four months of a petition. 11 U.S.C. § 96(a)(1) (1976) (repealed 1978). ADD20.

**C.     The Lower Court's Finding of Liability Erroneously Relies on a Legal Nullity: "Acts of Bankruptcy" Were Expressly Abolished in 1979.**

While "acts of bankruptcy" were specified in the Bankruptcy Act of 1898, the Bankruptcy Reform Act of 1978 specifically "abolishe[d] the concepts of acts of

20

bankruptcy" when Congress completely transformed the concept of bankruptcy by changing it from a system dedicated to creditor relief, to one focused on debtor relief. S. Rep. No. 989, 95th Cong., 2d Sess. 34 (1978); U.S. Code & Admin. News 1978, pp. 5787, 5820. *See also In re Kreidler Import Corp.*, 4 B.R. 256, 260 (Bankr. D. Md. 1980) (stating same and indicating "[t]he only basis for an involuntary case will be the inability of the debtor to meet its debts"). Congress reiterated that this Act "establish[ed] a uniform law on the subject of bankruptcies." H.R. 8200, P. Law 95-598, 92 Stat. 2549 (Nov. 6, 1978) ("The law relating to bankruptcy is codified and enacted as title 11…"). Accordingly, under current law, the bankruptcy statutes provide no "acts of bankruptcy."

Therefore, to employ any "act of bankruptcy" derived from ***any*** statute, the lower court either bypassed the express will of Congress in abolishing the term *or* determined Congress intended to retain the term solely for use within the FPS. The court did so despite the Bankruptcy Reform Act specifically amending the FPS to exclude bankruptcy cases from its coverage and exempting bankruptcy trustees from its provisions. Bankruptcy Reform Act of 1978, P. Law 95-589 (Nov. 6, 1978), 92 Stat. 2678 (adding section 3713(a)(2) and exempting bankruptcy trustees under section 3713(b)). The court ignored decisions of the Supreme Court interpreting related statutes *in pari materia* and subordinating the FPS to the bankruptcy acts (which abolished the term). *See, e.g., Romani* at 531 (collecting cases showing the

21

FPS was subordinated to the Bankruptcy Act of 1867 and again to the Bankruptcy Act of 1898); *Guarantee Title & Trust Co. v. Title Guaranty & Surety Co.*, 224 U.S. 152 (1912) (bankruptcy law applied instead of FPS because the "[bankruptcy] act takes into consideration, we think, the whole range of indebtedness of the bankrupt, national, state and individual, and assigns the order of payment").

Instead of adopting these principles, the lower court summarily concluded the argument was "unavailing" and contrary cases "stand for the general proposition of the effect of repeal of a statute, but they do not bear on the viability of Section 3713(a)(1)(A)(iii)." JA33. In doing so, the court seemed to rely solely on a district court opinion stating "[t]he term 'act of bankruptcy' still refers to the statutory definition contained in the Bankruptcy Act of 1898, former 11 U.S.C. § 21(a) (1976), even though the Bankruptcy Reform Act of 1978 supersedes the 1898 Act." *United States v. Golden Acres, Inc.* 684 F. Supp. 96, 101 (D. Del. 1988). That statement[2]– which, in turn, relied on a vacated decision from another district court – is fundamentally wrong. Aside from being non-binding and of no persuasive value, neither *Golden Acres* nor any court has actually addressed the issue of what, if anything, may be considered an "act of bankruptcy" subsequent to the enactment of

---

[2] *See United States v. Vertac Chem. Corp.*, 671 F. Supp. 595 (E.D. Ark. 1987), vacated, 1988 U.S. App. LEXIS 12456 (8th Cir. April 25, 1988). While that case was wrongly decided (and vacated), it acknowledged that "an 'act of bankruptcy' is not…defined in section 3713, but…draws its meaning from the law of bankruptcy." *Id.* at 621.

22

the Bankruptcy Reform Act of 1978. Indeed, in the most comprehensive treatise on the FPS, Professor Maloy specifically noted this conundrum twenty years ago:

> If the present Bankruptcy Code does not designate "acts of bankruptcy," then the United States is relegated to satisfying their prerequisite "act of bankruptcy" in order to establish priority under the Priority Statute, as they were defined the Bankruptcy Act of 1898. That Act, however, has been repealed. It would seem that this is a conundrum for the courts to figure out, or perhaps for Congress to resolve.

39 J. Marshall L. Rev. at 1271.

The Court should decide this issue of first impression by looking to the current bankruptcy statute itself – i.e., the Bankruptcy Reform Act of 1978. It should affirm Congress' express intent in abolishing the term altogether and reverse the lower court.

## D. Despite The Existence of a Comprehensive Bankruptcy Statute, the Lower Court Erroneously Relied on the Repealed Bankruptcy Statute It Replaced.

The second position the lower court adopted was that "acts of bankruptcy" in the FPS refers to language in the Bankruptcy Act of 1898, rather than the current bankruptcy statute that has been in force for nearly fifty years (or any other prior bankruptcy law). JA33-JA34. Since the Bankruptcy Act of 1898 was repealed in 1978, it stands on the same footing as each of the prior three bankruptcy statutes – i.e., it is a legal nullity.[3] *See Cook County National Bank v. United States,* 107 U.S.

---

[3] It makes little sense that the Bankruptcy Act of 1898, as a repealed statute, should take precedence over any other similarly repealed bankruptcy statute, which defined the term "acts of bankruptcy" differently. No cases decided

23

445, 451 (1883) (finding the National Banking Act trumped the FPS, stating "[a] law embracing an entire subject, dealing with it in all its phases, may thus withdraw the subject from the operation of a general law as effectually as though, as to such subject, the general law were in terms repealed"); *accord Guarantee Title. See also Ex parte McCardle*, 74 U.S. 506, 514 (1869) ("when an act of the legislature is repealed, it must be considered, except as to transactions past and closed, as if it never existed"); *Phillips v. Dime Trust & Safe Deposit Co.*, 284 U.S. 160 (1931) (same).

Since the Supreme Court has consistently found the meaning of "acts of bankruptcy" in the FPS by reference to the contemporaneous federal bankruptcy code, the lower court committed error by referring to a repealed statute instead of the contemporaneous code.

### E. The Lower Court Erroneously Disregarded Essential Elements Required for a Preference under the Repealed Bankruptcy Act.

The lower court relied on its earlier rulings denying Appellant's Motion for Summary Judgment to hold that "acts of bankruptcy" under the FPS are defined by the 1898 Bankruptcy Act. JA33, JA196. The court then agreed with the Government's argument that "preferential transfers" were thus an "act of bankruptcy" within the meaning of the FPS. JA70-JA71. Citing *United States* v.

---

applying other prior repealed bankruptcy statutes have found a naked preference to be an "act of bankruptcy" under the FPS.

24

*Golden Acres, Inc.*, 684 F. Supp. 96, 101 (D. Del. 1988) and *Lakeshore Apartments, Inc.* v. *United States*, 351 F.2d 349, 353 (9th Cir. 1965) ("*Lakeshore*"), the Magistrate Judge held that a preferential transfer was "a transfer . . . of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent." JA71.  This determination is perhaps the lower court's clearest error.

Prior to 1979, under then-applicable bankruptcy law, a preference was defined as follows:

> A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent ***and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class***.

11 U.S.C. § 96(a)(1) (1976) (repealed 1978) (emphasis added)  ADD20.

Instead of using the statutory definition of a "preference" from the statute the lower court was adopting, the court omitted a critical element of the statute which ***the Government could not satisfy***.  JA71.  The lower court simply ignored that there was no transfer of property by Lehcim "within four months before the filing by or against [it] of the petition initiating a proceeding under this [bankruptcy] title." Indeed, the record is clear that a petition in bankruptcy by or against Lehcim ***was***

25

*never filed*.  The lower court incorrectly applied the statute it cited, and committed reversible error.

> **F.      The Lower Court's Sole Justification for Liability Relies on a Ninth Circuit Decision That Admittedly Disregarded Essential Statutory Elements to Impose Liability.**

Rather than find that a "statutorily defined triggering event" had not occurred *by statute*, the lower court turned instead for support from caselaw, particularly *Golden Acres*, which in turn relied on *Lakeshore*.  JA33-JA35, JA71.  Setting aside that *Lakeshore* actually began with the correct starting point (unlike here) – i.e., it looked to the then current Bankruptcy Act – it is wrongly decided. More accurately, the Ninth Circuit took it upon itself to rewrite the law.  Since that function is reserved for Congress, this Court should decline to follow *Lakeshore*.

In *Lakeshore*, the defendants deliberately siphoned money of the company for their own benefit after foreclosure and receivership proceedings (i.e., collective proceedings) were commenced – ultimately resulting in contempt findings.  *Id.* at 351.  The Court then "applied" the Bankruptcy Act of 1898.  Determining Lakeshore committed an "act of bankruptcy," the Court stated:

> ….the Bankruptcy Act…enumerates six "acts of bankruptcy," one of which is the making or suffering of a "preferential transfer," defined elsewhere in the Act…to be "a transfer of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months of the petition [in bankruptcy] the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

26

Here, as noted earlier, the debts to A.B.C. had accrued long before they were paid, and their payment at a time when Lakeshore was insolvent necessarily favored those payees at the expense of other creditors. True, no petition in bankruptcy was ever filed by or against Lakeshore and hence none of the payments was made within four months thereof; but that fact could hardly deprive the payments of their real character. *We are fully aware that the time limitation specified in Section 60, sub. a of the Bankruptcy Act is an essential element of a transfer which is asserted as a ground for an adjudication of bankruptcy or to set aside as voidable a preference; but of course this is not such a proceeding*; to import the limitation into the priority statute is totally unnecessary to its functioning, would serve to defeat its purpose, and would be inconsistent with the Supreme Court's mandate of liberal construction.

*Id.* at 353 (emphasis added).  Thus, although the Ninth Circuit acknowledged that a preferential transfer only ***ever*** applies to transfers "within four months of the petition in bankruptcy" and that condition is "an essential element", it chose to disregard that element because following the law would "import" an "unnecessary" "limitation." This is window-dressing for impermissible legislation by the Ninth Circuit.

The flawed analysis in *Lakeshore* has never been endorsed by the Supreme Court or any other appellate court – nor should it be.  It is not possible to square its own admission that temporal proximity to a bankruptcy petition is "essential" with its subsequent statement that it is "unnecessary."  By definition, something "essential" is fundamental, basic, "of the utmost importance," indispensable, and ***necessary***.  And it is not possible to square the Ninth Circuit's application of "liberal construction" with bedrock principles of statutory interpretation.  *See, e.g., Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 107 (1944) (analyzing the Miller

27

Act, which was "highly remedial in nature" and "entitled to a liberal construction" but confirming "such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds"; "we cannot disregard the limitations on liability which Congress intended to impose and did impose" and "[s]pecific terms prevail over the general [terms]"); *Williams v. Kincaid*, 45 F.4th 759, 786 (4th Cir. 2022) (statute's "general instruction for liberal construction does not override the specific exclusions"); *Townsend v. Little*, 109 U.S. 504, 512 (1883) (when "general and specific provisions" are "in apparent contradiction, whether in the same or different statutes," the specific will "qualify…the general"). No court is permitted to pick and choose parts of statutes – particularly when adopting causes from other statutes – to obtain the result it prefers. Judges interpret and apply the law – they cannot rewrite it under the guise of liberal construction. The Ninth Circuit failed to uphold that basic maxim of American jurisprudence, and the lower court was wrong to follow along.

Before *Lakeshore*, the Supreme Court explained the necessity of each element of a preference under the same law:

> The statute recognizes the difference between the intent to defraud and the intent to prefer, and also the difference between a fraudulent and a preferential conveyance. One is inherently and always vicious; the other innocent and valid, except when made in violation of the express provisions of a statute. One is Malum per se and the other malum prohibitum, -- and then only to the extent that it is forbidden. A fraudulent conveyance is void regardless of its date; a preference is valid unless made within the prohibited period. It is therefore not in

28

itself unlawful to prefer nor fraudulent for one though insolvent to borrow in order to use the money in making a preference.

*Van Iderstine v. National Discount Co.*, 227 U.S. 575, 582 (1913). *See also Coder v. Arts*, 213 U.S. 223, 241 (1909) ("Preferences are set aside when made within four months, with a view to obtaining an equal distribution of the estate, and in such cases it is only essential to show a transfer by an insolvent debtor to one who himself or by his agent knew of the intention to create a preference. In constructing the bankruptcy act this distinction must be kept constantly in mind….a mere preferential transfer, as distinguished from a fraudulent one, was not an act in bankruptcy…"). *See also Davis v. Woolf*, 147 F.2d 629, 635 n. 2 (4th Cir. 1945) (following *Van Iderstine* and *Coder* and stating that a preference "is innocent and valid, except when made in violation of the express provisions of a statute"). The timing element and bankruptcy petition element are thus determinative. The Ninth Circuit was wrong to disregard this element, and the lower court was wrong to follow the Ninth Circuit.

If the lower court was correct in turning to the 1898 Act to find the definition of "acts of bankruptcy" – it was not – it should have applied those definitions as it found them, and not removed essential elements to the benefit of the Government's case.

29

**G.    The Lower Court Also Disregarded Precedent from the Supreme Court and This Court to Expand the FPS Beyond Collective Proceedings.**

Separate and apart from its erroneous determination that "acts of bankruptcy" include preferences, the lower court erroneously rejected Appellant's argument that "acts of bankruptcy" under the FPS are limited to collective proceedings.  JA9, JA70.

This Court has specifically held that a collective proceeding is required for the FPS to apply.  *United States v. Greenville,* 118 F.2d 963, 966-67 (4th Cir. 1941) ("We agree with the court below that, as no distribution in an insolvency proceeding is involved, the provision…[the FPS] has no application.").  *Accord*, *United States v. Crosland Constr. Co.*, 120 F. Supp. 792, 796 (D.S.C. 1954) ("The 'priority' statute applies only to cases involving some type of insolvency court proceeding disposing of an insolvent's estate").  *See also United States v. Woodside*, 34 F. Supp. 281, 283 (D.S.C. 1940), *aff'd in part and rev'd in part by Greenville* ("Any right of priority of the Government must necessarily arise at the time of the insolvency or act of bankruptcy within the meaning of the statute as interpreted by the courts, and such right of priority apparently presupposes that the insolvent debtor's assets have passed into the hands of some administrative officer, agency or a third person for distribution among the debtor's creditors.").  Since this was not a collective proceeding at all, the lower court's ruling must be reversed.

*Greenville* is in accord with multiple opinions of the United States Supreme Court.  *See, e.g. Conard v. Atlantic Ins. Co.*, 26 U.S. 386, 438-439 (1828) (statute

30

applies to "cases of insolvency, or where any estate in the hands of executors, administrators, and assignees"; application requires a "general divestment" and "mere inability of the debtor to pay all his debts" is not enough); *United States v. Marxen*, 307 U.S. 200, 207 (1939) (liability for FPS occurs once petition has been filed as "[t]he assets at that time are segregated for the benefit of creditors"); *James v. United States*, 366 U.S. 213, 242 n.4 (1961) (FPS is "pertaining to state insolvency proceedings against debtors"). *See also Kennebec Box. Co. v. O.S. Richards Corp.*, 5 F.2d 951, 952 (2d Cir. 1925) ("can be no claim in favor of even the most preferred of creditors until there is some fund available for the payment of all creditors of the insolvent"). Independent of the flawed analysis of "acts of bankruptcy," the lack of any insolvency proceeding here requires reversal of the lower court.

## III. The Lower Court's Judgment Violates Multiple Equitable Doctrines of Consistency and Lacks Evidentiary Support.

Finally, at trial, the Magistrate Judge allowed the Government to present mutually inconsistent positions on material facts, and then relied on both inconsistent positions in her verdict. The Government argued, and the court necessarily found, that the Government (1) had a valid claim of taxes due against Lehcim and (2) that Lehcim was insolvent. JA63-JA69. In claiming Lehcim owed taxes, the Government maintained the position consistently advocated by the IRS in the administrative proceedings: that the Nightingale advances ***were not*** "bona fide" loans and should be treated as equity from inception. JA65. In claiming Lehcim

31

was insolvent, however, the Government argued the reverse: that the Nightingale advances *were* bona fide loans and should be treated as liabilities since inception. JA56-JA57, JA65-JA66.

The court's acceptance of these dual positions violates established principles of judicial estoppel and the duty of consistency. Moreover, the court's explanation that these positions *are not inconsistent* is erroneous because (1) it defies logic, (2) it is not supported by cogent evidence and (3) it conflicts with requirements applicable to debt-equity recharacterizations. If the facts are applied consistently, the judgment must be reversed.

## A.    The Government's Inconsistent Positions

The first element of a cause of action under the Priority Statute is that the Government has a "claim." 31 U.S.C. § 3713(a). To prove that element, the Government relied on its 30-day letter of March 14, 2019. JA29. That letter stated in multiple places that the Nightingale "loans were determined to not be bona-fide and in this case, have characteristics more akin to equity transactions…" and were accordingly reclassified. *See, e.g.,* JA995. Therefore, the IRS disallowed Lehcim's interest expense deductions on its tax returns and generated the Government's tax claim. *Id.* The Government's witnesses repeatedly testified that the Nightingale advances were, and should be treated as, equity. JA426 (Trial Tr. Vol. II, 22:3-13) (Government's 30(b)(6) representative testifying that it was both the Government's

32

position in the tax exam, and now, that the loans are not bona fide liabilities). The recharacterization of the loans as equity resulted in the Government's tax claim – indeed, but for this position, there was no other basis for its claim.

The second element of a cause of action under 31 U.S.C. § 3713(a)(1) is that the "person indebted to the Government" is "insolvent." To prove this element, the Government offered the balance sheets on Lehcim's tax returns, and the testimony of its expert witness. The witness testified that Lehcim was insolvent because its liabilities exceeded its assets during the period that Lehcim was repaying its outstanding loans. JA58. But, in calculating Lehcim's net worth, *the witness treated all of the Nightingale advances as bona fide liabilities*. She testified that "[f]or purposes of solvency, I determined there was a 8.8 million-dollar liability as of the date that the repayment plan was put in place." JA779 (Trial Tr. Vol. III, 155:12-16). She "assumed these were all bona fide liabilities" and "treated them as they were treated in the books and records and how they were represented in the repayment plan." JA778 (Trial Tr. Vol. III, 154:7-15). The bona fides of the Nightingale loans were material to her testimony; the witness admitted that if the loans were not bona fide, all but the last two transactions were made at a time when Lehcim was *not* insolvent. JA759-JA766 (Trial Tr. Vol. III, 135:5-142:18). To avoid this, the expert witness altogether ignored the position of the IRS in her analysis. JA777-JA780 (Trial Tr. Vol. III, 153:22-156:20).

33

The Government's two positions cannot be reconciled. The Government generated its claim under the FPS by disallowing "non-bona fide" liabilities, and then in the same case classified the very same items as "bona fide" liabilities for the purpose of establishing insolvency. No matter how the Government tries to justify this duality, it "prevail[ed] in one phase of [the] case on an argument and then rel[ied] on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

## B. The Lower Court's Adoption of The Government's Inconsistent Positions

The lower court committed reversible error by permitting the Government to maintain these conflicting positions, and again by adopting those positions in its opinion imposing liability upon Appellant. First, the lower court found that the Government's claim – as set forth in the March 14, 2019 letter – established the first element of the FPS. JA63-JA64. As the lower court stated: "The United States— more specifically, the IRS—audited Lehcim's tax returns and concluded that the interest deduction for the Nightingale loans should be disallowed, which ultimately resulted in a notice of tax deficiency." JA65. Although the lower court avoided saying so, the only reason to disallow the interest deduction was the IRS's position

34

that the loans were not bona fide (and were instead equity). JA995. Thus, the lower court adopted the Government's first position.

Then the lower court adopted the Government's position that Lehcim was insolvent, and specifically that the Nightingale loans were in fact bona fide liabilities. In doing so, the Magistrate Judge said she was applying the balance sheet test. JA64. She credited the Government's expert witness's explanation that "in March of 2019, there was a repayment plan set up. So[,] from an accounting standpoint, if you're going to pay somebody $8.8 million, whether it's a repayment of a past loan or whether it's a payment of some other expense, that $8.8 million is an *obligation of some kind*." JA65 (Emphasis supplied). The court explained its ruling:

> In other words, irrespective of whether the Nightingale loans were treated as debt or equity, Lehcim had an *obligation* of approximately $8.8 million by virtue of its execution of the repayment plan and transfer of funds to Nightingale. The United States has therefore not taken contradictory positions with respect to whether the Nightingale loans were bona fide.

JA65-JA66 (Emphasis supplied).

But, a finding of an "obligation" has no relevance. Insolvency in the balance sheet test compares assets and liabilities – not "obligations." *Bramwell v. U.S.F. & G. Co.*, 269 U.S. 483, 487 (1926) (test of insolvency is "if its liabilities exceed all its assets"). To the extent the term "obligation" has any meaning in this context, this Court has previously concluded that an "obligation" can be considered either debt

or equity. *In re Dornier Aviation (N. Am.), Inc.,* 453 F.3d 225, 231 (4th Cir. 2006) ("Thus, implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or equity."). Ms. Hollobaugh would not say what type of "obligations" these were, claiming she needed more information. JA57-JA58, JA760-JA761 (Trial Tr. Vol III, 136:9-137:2). Accordingly, since Lehcim could not be found to be insolvent without first determining whether these "obligations" were debt – which the lower court did not actually decide – its decision cannot stand.

### C. The Lower Court Adopted the Erroneous Debt-Equity Determination in Order to Avoid Apparent and Incompatible Inconsistencies.

A component of the lower court's incorrect decision to label the Nightingale advances as "obligations" was the court's adoption of the Government's expert witness's misleading testimony that the fact of the repayment plan meant that the Nightingale loans that the Government had determined were equity, were now transformed into something else. This was an attempt by the witness to change the character of the loans ***only from the time of the repayment plan forward*** to avoid inconsistency. However, litigants and courts cannot label transactions inconsistently across time periods when making debt-equity determinations. Courts universally adhere to the rule that a transaction's character must be determined ***ab initio***.

36

By finding that the same instruments could be something for many years (i.e., equity) and then changing them to the opposite later (i.e., debt), the court erroneously employed a pick-and-choose approach.  The lower court's decision relied on the government's expert's claim that the transactions became unspecified "obligations" due to the "repayment plan." JA65-JA66 ("…irrespective of whether the Nightingale loans were treated as debt or equity, Lehcim had an obligation of approximately $8.8 million by virtue of its execution of the repayment plan" in 2019).  In other words, notwithstanding classification by the IRS of the loans as equity for years prior, the repayment plan caused a conversion from equity to debt.

This approach finds no support in the law.  For example, in *In re HH Liquidation, LLC*, 590 B.R. 211, 290 (Bankr. D. Del. 2018), the court held that ***any*** recharacterization occurs "ab initio."  "[T]he goal is to look at the evidence to determine 'what the parties actually intended'" in "account[ing] for the advance as a loan or equity."  *Id.* at 289.  As a result of the determination, "the advance does not disappear; instead it becomes equity in the borrowing parties with all rights and privileges associated with equity."  *Id.* at 290.  *See also United States v. State Street Bank & Tr. Co.*, 520 B.R. 29, 74 (Bankr. D. Del. 2014) (*citing In re Autostyle Plastics, Inc.*, 269 F.3d 726, 747-48 (6th Cir. 2001)); *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) ("Recharacterization is appropriate where the circumstances show that a debt transaction was "actually an equity contribution ab

37

initio."); *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 234-235 (4th Cir. 2006) (following *In re Cold Harbor Assocs.*).  Stated differently, "[t]he debt-versus-equity inquiry is not an exercise in *recharacterizing* a claim, but of *characterizing* the advance's true character." *In re Georgetown Bldg. Assocs. Ltd. P'ship*, 240 B.R. 124, 137 (Bankr. D.D.C. 1999) (emphasis in original) ("The court will not allow such legerdemain to convert what was a capital contribution into a debt obligation, transmuting what was pyrite into gold.").

The entirety of the debt-equity analysis is based on the intent of the parties at inception.  If ad hoc determinations were permitted, parties would be free to change litigating positions based on circumstances that were not present at the time of the transaction (e.g., lack of payment, changes in interest rates, etc.).  The law does not work that way.  *See, e.g., In re Franklin Equip. Co.*, 416 B.R. 483, 519 (Bankr. E.D. Va. 2009) ("unable to locate any decision" where characterization "transformed" from its origin because "decisions teach that a court considering recharacterization must center its focus on the time at the origination of the challenged transaction"); *In re Georgetown Bldg. Assocs. supra; In re Highland Constr. Mgmt. Servs., LP*, 569 B.R. 673, 681-82 (E.D. Va. 2017) (describing similar maneuvers as "chicanery").

In sum, in an attempt to avoid the clear inconsistency presented by the Government's contention that the Nightingale advances were simultaneously debt and not debt (but equity), the lower court's decision impermissibly created a new

38

4902-5919-0190, v. 1

term – "obligation" – that is wholly irrelevant to an insolvency analysis and violated rules of recharacterization requiring consistency. This unwarranted back and forth cannot support statements that "[t]he United States has therefore not taken contradictory positions." JA66. Instead, the lower court's conclusion endorses the same "chicanery" and "legerdemain" decried in this and other circuits, rendering it erroneous.

### D.    The Lower Court's Determination Violates Principles of Judicial Estoppel.

Moreover, the lower court erroneously found judicial estoppel inapplicable because the Government's positions did not create "a perception that 'either the first or the second court was misled'" and because the Government did not "act[] in bad faith or intentionally misle[a]d an administrative or judicial tribunal." JA66-JA67. The court concluded that these "required elements" were lacking. Judicial estoppel is not, however, so narrowly construed.

The lower court cited *Minnieland Private Day Sch., Inc. v. Applied Underwriters*, 867 F.3d 449, 458 (4th Cir. 2017) to establish four "required" elements: (1) adoption of a position inconsistent with a stance taken in prior litigation; (2) the position estopped must of fact rather than law or legal theory; (3) the prior inconsistent position must have been accepted by the court; and (4) the party to be estopped must have intentionally misled the court to gain unfair advantage. JA66. These elements are not "required." *See, e.g., Lowery v. Stovall*,

39

92 F.3d 219, 223-24 (4th Cir. 1996) (applying elements but noting "determinative factor" is perception of intentionally misleading the court, not mistake in prior position). This Court has stated the doctrine is "probably not reducible to any general formulation of principle" and it has found circumstances where a lower court's reliance on these "elements" was improper. *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166-67 (4th Cir. 1982) (focused on preventing "intentional self-contradiction").

Importantly, the Supreme Court has held that the above-referenced items are only "factors" and "considerations." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) ("we do not establish inflexible prerequisites or an exhaustive formula"). Instead, judicial estoppel is invoked based on the "balance of equities." *Id.* Application of the doctrine must consider all facts and circumstances. *See also Martineau v. Wier*, 934 F.3d 385, 394 (4th Cir. 2019) (citing *New Hampshire* to explain that the doctrine depends on the "specific factual context" and is not a "general formulation" or "inflexible" rule). Moreover, judicial estoppel can apply to different phases in the same case. *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 619-20 (2025) (Thomas, J. dissenting).

Here, the balance of equities "prevent[s] [the Government] from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram*, 530 U.S. at 227 n. 8. The Magistrate Judge

40

correctly noted that one of the reasons the doctrine is typically invoked is to prevent a party "from 'blowing hot and cold as the occasion demands'…." JA66. Yet, that is exactly what the Government did in this case. When the occasion demanded, the Government said that the Nightingale loans were not liabilities; then it "blew cold" and said that they were liabilities when the occasion required it to prove insolvency. The lower court should have applied the doctrine and refused to adopt the Government's blatantly inconsistent positions.

The lower court also said that the Government's position was not adopted by a tribunal. However, it was adopted earlier by the court – itself a tribunal – in this very case. Since the doctrine can and should apply to prevent a party from blowing hot and cold in the same case, it is immaterial whether the Government's prior position was presented to a different tribunal. Moreover, positions taken in administrative proceedings can justify application. *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196-97 (4th Cir. 1998) (employing judicial estoppel where party claimed a disability to obtain Social Security benefits); *Core Communs., Inc. v. Verizon Maryland LLC*, 744 F.3d 310, 323 n. 16 (4th Cir. 2014) (not condoning "U-turn" of position taken to receive approval from agency); *Bull v. United States*, 295 U.S. 247, 260 (1935) (tax assessments, through administrative, given force of judgment and supersede pleadings, proof, and judgment necessary at law). The court's failure to apply judicial estoppel was erroneous because, not only do the facts

41

and circumstances require it, but also because the lower court misapplied the law to those facts.

**E.    The Lower Court's Determination Violates the Related Doctrine of Consistency.**

An offshoot of the doctrine of judicial estoppel is the doctrine of consistency. Courts have long forbidden parties from taking mutually exclusive and inconsistent positions to advance litigation strategy to the detriment of adversaries. *See, e.g., Robb v. Vos*, 155 U.S. 13, 42-43 (1894) (discussing equitable doctrine in cases prohibiting remedies based on inconsistent assertions).

This doctrine prevents the Government from taking mutually exclusive positions in the assessment (or determination) of tax and the later collection of that same tax. In *United States v. Brown*, 86 F.2d 798, 799 (6th Cir. 1936), the court held that where two competing positions could be elected, the government "could not pursue both courses." There, the government could either pursue transferee liability against the individual shareholders – on the basis that they held property distributed after the corporation owed tax – or it could pursue the shareholders directly on a theory that they were liquidating distributions constituting income to them. *Id.* Once a theory is chosen, "[t]he Government is bound by its election." *Id. See also United States v. Oregon Lumber Co.*, 260 U.S. 290, 301 (1922) ("to hold that plaintiff may then invoke another and inconsistent remedy is not to recognize an exception to the general operation of the doctrine of election of remedies but to deny the doctrine

42

altogether"). *See also Vestal v. Commissioner*, 152 F.2d 132, 136-37 (D.C. Cir. 1945)

(applying doctrine of consistency against IRS and forbidding it from imposing

liability on one theory and later imposing it on separate, inconsistent theory). The

inconsistent positions here are similar to those rejected in *Joseph Eichelberger &*

*Co. v. Commissioner*, 88 F.2d 874, 875 (5th Cir. 1937):

> This conclusion is fortified by the rejection of the claim of loss in 1930
> on the ground that the then sale was not a real one and could not realize
> a loss. Whether that decision was right or wrong, the accredited officer
> of the United States made it. He cannot justly decide in 1930 that the
> sale did not realize the loss and thereby collect increased taxes, and in
> 1932 decide that it did realize the loss and collect taxes accordingly
> again. We said in Perkins et al. v. Thomas, Collector, 86 F.(2d) 954,
> 956: "It is manifestly unjust to allow the government, having thus
> informed the taxpayer he could not have the deduction for his invested
> capital in 1928, now to say he could have it only then." This is not a
> case of a taxpayer who neglected to assert his rights and so lost them
> by limitation. It is not a case of taking bad advice given by a mere
> revenue agent as in Darling v. Commissioner (C.C.A.) 49 F.(2d)
> 111. The right was claimed in the 1930 return and disallowed by the
> Commissioner. The United States got the benefit of his decision then
> and ought to abide by it now.

*See also Route 231, LLC v. Commissioner*, 810 F.3d 247, 258-259 (4th Cir. 2016)

("It is no more right to allow a party to blow hot and cold as suits his interests in tax

matters than in other relationships. Whether it be called estoppel, or a duty of

consistency, or the fixing of a fact by agreement, the fact fixed for one year ought to

remain fixed in all its consequences, unless a more just general settlement is

proposed and can be effected.") (*quoting Alamo Nat'l Bank v. Commissioner*, 95

F.2d 622, 623 (5th Cir. 1938)).

43

4902-5919-0190, v. 1

Courts apply the duty where (1) the taxpayer or the IRS makes a representation of fact or reported an item for tax purposes in one tax year; (2) the taxpayer or IRS acquiesces or relies on that fact for that year; and (3) the taxpayer or IRS desires to change the representation, previously made, in a later tax year. *Johnston v. United States*, 605 F. Supp. 26, 28 (D. Mo. 1984); IRS FSA 200026006 (IRS adopting analysis in *Johnston*) ADD139; *Estate of Ashman v. Commissioner*, 231 F.3d 541 (9th Cir. 2000) (applying doctrine of consistency). *See also In re Horstemeyer*, 2016 Bankr. LEXIS 2471 (Bankr. D.S.C. June 30, 2016) (discussing applicability of doctrine against IRS); *Sirbo Holdings, Inc. v. Commissioner*, 476 F.2d 981 (2d Cir. 1973) (stating doctrine imposes duty against even similarly situated taxpayers).

Here, the Government already elected not only to assess tax but to seize assets from a third party on the basis of these advances being equity. *See Neuberger Quinn v. United States*, 2024 U.S. Dist. LEXIS 114060 (D. Md. June 28, 2024) (for same tax liabilities of Lehcim, government seized property by levy). And this doctrine must apply "whether or not there be present all the technical elements of estoppel." *Conway Import Co. v. United States*, 311 F. Supp. 5, 14-15 (E.D.N.Y. 1969) (*citing Orange Securities Corp. v. Commissioner*, 131 F.2d 662, 663 (5th Cir. 1942) ("[w]hen such a fact or transaction is projected in its tax consequences into another year there is a duty of consistency…"); *Rollins v. Commissioner*, 1993 Tax Ct. Memo

44

LEXIS 659 (T.C. Dec. 30, 1993) (applying same concept against IRS); *Anderson v. Bowers*, 117 F. Supp. 884, 889 (D.S.C. 1954) (accord).

The lower court's judgment should be reversed because it failed to apply the duty of consistency.

**F.    The Lower Court's Determination Lacks Evidentiary Support.**

Over and above the failure to apply these equitable doctrines, the lower court's decision fails for lack of evidentiary support. That is, the lower court's determination that the Nightingale advances constitute "obligations" cannot sufficiently prove insolvency under the balance sheet test of insolvency. JA64 (balance sheet test controls).

**1.    The Lower Court Erroneously Relied Exclusively on an Unqualified Expert's Opinion on a Question of Law.**

To start, the only basis for the lower court's determination is an inadmissible conclusion of the Government's expert, Jessica Hollobaugh. JA55-JA58. Here, Ms. Hollobaugh was not admitted as an expert in the classification of debt or equity – nor could she have been. JA55. This determination is a matter of law for which expert testimony is not relevant. *See, e.g., Gill v. Jus. Broad. Corp.*, 2024 U.S. Dist. LEXIS 160831, *12-13 (E.D.N.Y. Sep. 6, 2024) ("expert" could not offer this conclusion on debt-equity classification since it was a legal issue); *Indmar Prods. Co. v. Commissioner*, 444 F.3d 771 (6th Cir. 2006) (debt-equity determination is a

45

legal issue). JA33, JA198 (excluding Appellant's own expert's opinion because he proposed to opine on the law). Therefore, as a threshold matter, the lower court's finding of insolvency lacks evidentiary support and must be reversed.

Additionally, the lower court's analysis nowhere suggests it looked to the intent of the parties in determining characterization. In making assumptions on the character of the advances and relying solely on later tax returns, the Government's expert did not review the intent of the parties and disregarded the facts and related determination of the IRS. *See Tyger Const. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994) ("when the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court"). This Circuit has previously denounced opinion testimony as "not sufficient to establish the debtor's insolvency" where "substantial questions remain" and "[n]o witness had any information as to the fair value of the property, only its book value." *In re Lamar Haddox Contractor*, 40 F.3d 118, 122 (5th Cir. 1994). It is not clear how Lehcim's unilateral decision to repay these advances had any bearing on the intent of the parties either.[4] The judgment must be reversed on this basis as well.

---

[4] In its 30-day letter, the IRS performed an analysis of the character of the advances from their inception and determined that they were properly classified as capital contributions or equity (not debt). JA995-JA997. Here, the Government's expert explicitly stated she was simply treating the advances the same way that they were represented on Lehcim's books and records – the same ones that had been recharacterized by the IRS. JA57.

46

## 2.     The Analysis for Making Debt-Equity Determinations Is the Same for Purposes of Tax and Insolvency.

Finally, the lower court erred in concluding that the determination of the IRS was not the "right test" simply because the government's expert said so. JA65-JA68. In reality, the analysis employed by the IRS in classifying the advances as equity is the same as what should have been, but was not, employed by the lower court. Its failure to employ ***any test*** requires reversal.

Debt-equity determinations are fairly common in both tax and insolvency contexts. In both, courts weigh the facts and circumstances, looking at the economic realities. *See, e.g., In re Autostyle Plastics, Inc.*, 269 F.3d 726, 750-753 (6th Cir. 2001) (using eleven-factor test from *Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625 (6th Cir. 1986) (a tax case)). As expressed in *In re Hedged-Investment Assocs.*, 380 F.3d 1292, 1298 (10th Cir. 2004):

> Recent tax law cases in other circuits have used a more extensive set of criteria to judge whether funds advanced to a now-bankrupt entity were true loans or camouflaged equity investments. However, these expanded criteria are fully consistent with our more generally phrased test in *Mid-Town*, and the tax cases seek to vindicate government interests similar to the interests of competing creditors and investors in the bankruptcy context.

*See also In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225 (4th Cir. 2006) (applying same set of factors).

Here, in classifying the advances as equity, the Government concluded:

47

4902-5919-0190, v. 1

> The purported loans were determined to not be bona-fide and in this case, have characteristics more akin to equity transactions, including, among other things, long maturity dates, inadequate capitalization, lack of payments, and the apparent lack of enforceable loan documents. Adjustments are necessary to reclassify the loans to equity as additional paid in capital.

JA995. In so finding, the IRS reiterated that "[it] is a well-established principle that the economic reality or substance of its transaction, rather than its form, controls for tax purposes." JA997. Here, the test employed by the IRS in recharacterizing the advances as equity was based on a multi-factor economic substance analysis. JA995-JA997. *See also* JA431-JA432, JA440 (Trial Tr. Vol. III, 27:7-28:6; 36:1-6) (United States' designee testifying at trial: "We [the government] stand by the position that the loans are not bona fide.") (as the loans are not bona fide, the government considers them to be equity and they should be reclassified as additional paid in capital); JA380 (Trial Tr. Vol I, 181:7-21) (IRS determination was based on the "economic substance and reality").

Since a determination of debt or equity is the same for purposes of insolvency and tax, the government's expert, the Government, and the lower court had no justification for saying otherwise. The failure to apply *any* test, because it conflicted with the analysis already conducted by the IRS and relied upon by the Government here, is erroneous.

4902-5919-0190, v. 1

## CONCLUSION

For the reasons stated above, this Court should reverse the judgment of the district court granting judgment in favor of the Government.

/s/James P. Ulwick
JAMES P. ULWICK
KRAMON & GRAHAM, P.A.
750 East Pratt St., Suite 1100
Baltimore, MD 21202
(410) 752-6030
julwick@kg-law.com

/s/ Brandon N. Mourges
BRANDON N. MOURGES
CREPEAU MOURGES
1344 Ashton Rd., Suite 110
Hanover, MD 21076
(667) 900-9912
brandon@usataxlaw.com

May 21, 2026

## REQUEST FOR ORAL ARGUMENT

Counsel for the appellant assert that the issues raised in this brief may be more fully developed through oral argument, and respectfully request the same.

49

## **<u>CERTIFICATE OF COMPLIANCE</u>**

1. This Brief of the Appellant has been prepared using Word for Office 365 software, Times New Roman font, 14-point proportional type size.

2. EXCLUSIVE of the table of contents, table of authorities, signature block, statement with respect to oral argument, and this certificate of compliance, this brief contains no more than 13,000 words, specifically 11,989 words.


I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

<u>May 21, 2026</u>                                      */s/James P. Ulwick*
Date                                                      James P. Ulwick

4902-5919-0190, v. 1